**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**CITY OF JACKSON, MISSISSIPPI**                                        **PLAINTIFF**

**versus**                          **CIVIL ACTION NO.:** ___3:20-cv-280-HTW-LRA___

**JAXON ENERGY, LLC, EMERALD PARTNERS, LLC,
SMITTY'S SUPPLY, INC., EDGAR RAY SMITH III,
ZACHARY D. KENT, CHAD E. TATE, & JASON HENSLEY**                **DEFENDANTS**

---

**ORIGINAL COMPLAINT
(JURY TRIAL DEMANDED)**

---

**NOW INTO COURT**, by and through undersigned counsel, comes the City of Jackson, Mississippi ("City of Jackson"), and files its Original Complaint against Jaxon Energy, LLC ("Jaxon Energy"), Emerald Partners, LLC ("Emerald"), Smitty's Supply, Inc. ("Smitty's"), Edgar Ray Smith III ("Smith"), Zachary D. Kent ("Kent"), Chad Tate ("Tate"), and Jason Hensley ("Hensley"), and in support thereof, states as follows:

## INTRODUCTION

1.1    The United States Congress enacted the Energy Independence and Security Act in 2007 ("EISA"). A subtitle within EISA is the Renewable Fuel Standard ("RFS"). The RFS requires oil companies to meet an annual renewable fuel obligation.

1.2    An oil company can satisfy its renewable fuel obligation by purchasing renewable fuels or by purchasing credits awarded to renewable fuel manufacturers. These credits are identified and tracked through a Renewable Identification Number ("RIN").

1.3    Jaxon Energy is engaged in the business of converting corn and soybean oils into renewable fuel. It earns profits through the sale of renewable fuel and RIN credits.

1.4     Jaxon Energy operates a facility ("Facility") that is located at 425 and 455 Industrial Drive, Jackson, Mississippi. The hydrogen reformer is located at 425 Industrial Drive. The corporate offices and hydrotreatment plant are located at 455 Industrial Drive.

1.5     Over the course of the last two years, Jaxon Energy and its co-defendants have polluted the ditches, creeks, and stormwater drains surrounding the Facility and have undertaken efforts to conceal the pollution.

1.6     Jaxon Energy and its co-defendants have also knowingly, willfully, surreptitiously, and unlawfully taken tens of millions of gallons of water from the City of Jackson for use at the Facility and intentionally withheld payment from the city.

1.7     The City of Jackson brings this action against Jaxon Energy, Emerald, Smitty's, and certain officers and agents of these intertwined entities to obtain compensatory damages, punitive damages, attorneys' fees, litigation costs, pre-judgment and post-judgment interest, and equitable relief. The City of Jackson demands a jury trial on all issues within this civil action that are so triable.

## PARTIES

2.1     The City of Jackson is a municipal corporation and political subdivision of the State of Mississippi and exists under the laws of the State of Mississippi.

2.2     Jaxon Energy is a limited liability company. Jaxon Energy's members include Smith and Emerald. Smith is the manager of Jaxon Energy.

2.3     Emerald is a limited liability company. Smith is the sole member and manager of Emerald.

2.4     Smitty's is a Louisiana corporation that maintains its principal place of business at 63399 Highway 51 North, Roseland, Louisiana. Smitty's is the parent company of Jaxon Energy. Smitty's performs human resource, finance, operations management, marketing, nonproduction, and other tasks for Jaxon Energy.

2.5     Smith is an adult resident citizen of the State of Louisiana. He was an officer and agent of Jaxon Energy, Emerald, and Smitty's on all occasions alleged in this pleading.

2.6     Kent is an adult resident citizen of the State of Louisiana. He was an agent of Jaxon Energy on all occasions alleged in this pleading.

2.7     Tate is an adult resident citizen of the State of Louisiana. He was an officer and agent of Smitty's and Jaxon Energy on all occasions alleged in this pleading.

2.8     Hensley is an adult resident citizen of the State of Louisiana. He was an officer of Jaxon Energy and an agent of Smitty's on all relevant occasions.

## SERVICE OF PROCESS

3.0     Jaxon Energy may be served with process via its registered agent, Corporation Service Company, 7716 Old Canton Road, Suite C, Madison, Mississippi 39110.

3.1     Emerald may be served with process pursuant to Miss. Code Ann. § 13-3-57 ("Long-Arm Statute") at 63399 Highway 51 North, Roseland, Louisiana 70456, or wherever it may be found.

3.2     Smitty's may be served with process via its registered agent, CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

3.3     Smith may be served with process pursuant to the Long-Arm Statute at 63399 Highway 51 North, Roseland, Louisiana 70456, or wherever he may be found.

3.4     Kent may be served with process pursuant to the Long-Arm Statute at 1804 Nashville Avenue, Hammond, Louisiana 70401, or wherever he may be found.

3.5     Tate may be served with process pursuant to the Long-Arm Statute at 18202 Highway 16, Amite, Louisiana 70422, or wherever he may be found.

3.6     Hensley may be served with process pursuant to the Long-Arm Statute at 63399 Highway 51 North, Roseland, Louisiana 70456, or wherever he may be found.

## JURISDICTION & VENUE

4.1     Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.

4.2     Defendants are subject to personal jurisdiction for the following reasons:

a.   Jaxon Energy is physically present within Mississippi. Moreover, Jaxon Energy engaged in tortious actions within and directed to Mississippi, did business within Mississippi, and entered into contracts with Mississippi residents that were performed within Mississippi.

b.   Emerald engaged in tortious actions within and directed to Mississippi.

c.   Smitty's engaged in tortious actions within and directed to Mississippi and did business within Mississippi.

d.   Kent engaged in tortious actions within and directed to Mississippi and did business within Mississippi.

e.   Smith engaged in tortious actions within and directed to Mississippi and did business within Mississippi.

f.   Tate engaged in tortious actions within and directed to Mississippi and did business within Mississippi.

g.   Hensley engaged in tortious actions within and directed to Mississippi and did business within Mississippi.

4.3     The exercise of personal jurisdiction over the defendants comports with the Due Process Clause of the 14th Amendment.

4.4     Venue is proper because substantial alleged acts and omissions occurred at the Facility and because substantial events causing injury to the City of Jackson occurred at the Facility.

## JOINDER

5.1     The defendants are permissively joined pursuant to Fed. R. Civ. P. 20(a)(2) because the plaintiff has asserted rights to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences, and questions of law or fact common to all defendants will arise in this action.

## FACTUAL BACKGROUND

**A. The failure to pay for tens of millions of gallons of water taken from the City of Jackson.**

6.1     The City of Jackson owns, operates, and maintains a waterworks system and prescribes rates at which water is supplied to the city's inhabitants. *Miss. Code Ann.* §§ 21-27-7. It is unlawful for the City of Jackson "to supply water free of charge, or in any amount less than the fixed charges, to any person, firm or corporation, except as is expressly authorized by law." *Id.*

6.2     The City of Jackson installed a 4-inch main line at 425 Industrial Drive in October 2016, to supply water to Jaxon Energy's hydrogen reformer. On December 6, 2016, Jaxon Energy paid $10,982.34 to the City of Jackson for the installation. True and correct copies of Jaxon Energy's check number 1898 making payment to the city and the city's receipt are attached hereto and incorporated herein *in globo* as Exhibit 1.

6.3      The Facility was in its construction phase throughout 2016 and 2017.

6.4     In February 2018, Jaxon Energy contracted with Hargrove Engineers and Constructors to commission the hydrogen reformer and to train employees in its operation.

6.5     Smith asked Jaxon Energy's office manager, Misty Tracy, on April 11, 2018, to provide him with the Facility's anticipated utility costs once the hydrogen reformer came online. General manager Ron Bell provided her with these figures.

6.6     The hydrogen reformer uses water to control temperatures and make steam. It operates 24-hours per day, 365-days per year, and is only taken offline for routine maintenance. Tracy

notified Smith that the Facility's "anticipated water usage" would increase to approximately 80,000 gallons per day when the hydrogen reformer came online and the total monthly water cost would be approximately $77,040. A true and correct copy of the text message documenting this exchange is attached hereto and incorporated herein as Exhibit 2.

6.7     The hydrogen reformer came online on or about May 2018. Tracy notified Smitty's accounts payable clerk, Madelyn Wilkinson, on November 14, 2018, that Jaxon Energy had received bills for water usage at 455 Industrial Drive, but had "yet to receive an invoice from our 425 Industrial Dr. location for water meter usage." Tracy asked, "Have you guys received [an invoice] at our PO Box there in Roseland? If not, [w]ill you have Kaylee or someone call City Services and find out why it has not been received." A true and correct copy of this email and its attachment is attached hereto and incorporated herein as Exhibit 3.

6.8     Smith visited the Facility in late-December 2018. Tracy discussed the unpaid water usage issue with him. Tracy was concerned the Facility would receive an unusually high bill for months of unpaid water usage at 425 Industrial Drive. Smith told Tracy, "Chad [Tate] and me will handle it. Leave it alone."

6.9     Tracy discussed the issue with Tate despite Smith's admonishment. Tate told Tracy that it was not her responsibility to ensure Jaxon Energy paid for water usage at 425 Industrial Drive.

6.10    I&E Technician Jaime King discussed Jaxon Energy's failure to pay for water usage at 425 Industrial Drive with Tate and Smitty's employees, Madelyn Wilkinson and Mary Martin, on several occasions between May 2018 and July 2019. King told them the City of Jackson had experienced widespread issues with water meters and billing and explained that Jaxon Energy needed to make approximate monthly payments to the City of Jackson for water usage at 425 Industrial Drive.

6.11    Tate rejected King's advice. Tate did not notify the City of Jackson that it had supplied and was continuing to supply tens of thousands of gallons of water to 425 Industrial Drive on a daily

basis, and did not notify the City of Jackson that Jaxon Energy had not paid and was continuing to not pay for the water supplied to 425 Industrial Drive.

6.12    Jaxon Energy has also routinely pulled the caps off of the fire hydrants at the Facility, attached hoses, opened the hydrants, and utilized the water to fill the cooling tower and supplement the water supplied by the 4-inch main line. Jaxon Energy has unlawfully taken a substantial amount of water from the hydrants over the course of the last two years.

6.13    The City of Jackson did not authorize Jaxon Energy's use of the hydrants and did not authorize Jaxon Energy's water usage from the 4-inch main line and hydrants.

6.14    The City of Jackson uses Hershey water meters. Water meters measure units of water. A unit of water is 100 cubic feet or 748 gallons. In most cases, the water meter is generally located in the ground near the curb in front of the property being serviced.

6.15    The City of Jackson has visited the Facility in recent weeks to search for a water meter that services 425 Industrial Drive. The City of Jackson did not observe a visible water meter.

6.16    Jaxon Energy has knowingly and surreptitiously taken, used, and not paid the City of Jackson for tens of millions of gallons of water supplied to 425 Industrial Drive over the last two years.

**B. The December 17, 2018, illegal disposal of hazardous materials.**

6.17    Smith promoted Kent to plant manager on or about December 17, 2018. Three days later, employees discovered the EX4 Exchanger was leaking large amounts of diesel. The diesel covered a substantial portion of the Facility and continued to leak for several days. Kent ordered employees to pressure wash the diesel into a stormwater drain.

6.18    Tracy, King, and other employees informed Kent that it was illegal to pressure wash diesel into storm drains. Kent said Smith ordered him to dispose of the diesel in this fashion.

6.19 Tracy's job responsibilities included the submission of monthly stormwater reports to the Mississippi Department of Environmental Quality ("MDEQ"). After this incident, Tracy notified Kent that she was not going to falsify monthly stormwater reports to the MDEQ. Tracy told Kent that someone else would need to prepare and submit the reports if ownership and management intended to conceal reportable incidents. Kent thereafter assumed all responsibility for the filing of monthly stormwater reports with the MDEQ. Kent failed to notify the MDEQ of the diesel spill.

### C. The December 27, 2018, illegal disposal of hazardous materials.

6.20 On or about December 27, 2018, there was another large diesel spill at the Facility. Kent ordered workers to soak up the diesel with absorbent pads and to place the used pads in a Waste Management dumpster. Kent ordered the workers to pressure wash the remainder of the diesel fuel into the stormwater drain. King was concerned the diesel spill was not managed consistent with federal, state, and local laws. King reported the diesel spill and clean-up efforts to Tracy.

6.21 Tracy and King notified Kent that Jaxon Energy needed to report the spill to the MDEQ. Kent failed to do so. Tracy and King also complained to Kent that it was illegal to dispose of soiled absorbent pads in the Waste Management dumpster. Kent told them that Smith had ordered him to place the soiled pads in the dumpster. Kent refused to properly dispose of the pads.

### D. The January 9, 2019, illegal disposal of hazardous materials.

6.22 On or about January 9, 2019, Tracy learned the slop tank was approaching maximum capacity and needed to be emptied. Jaxon Energy had previously hired Frac-N-Vac to empty the slop tank and test its contents for hazardous materials. Frac-N-Vac had charged approximately $21,576.00 to empty, test, and store the slop tank's contents in 2018.

6.23 Smith refused to incur a similar expense in 2019. Smith ordered Hensley and Kent to empty the slop tank into the oil-water separator. The slop tank contained feedstock solids, naphtha, diesel fuel, and other hazardous and nonhazardous materials.

6.24   The capacity of the oil-water separator is far less than that of the slop tank. When the oil-water separator's capacity is reached, it overflows into ditches, drains, and a creek that runs in front of the Facility. The oil-water separator – which also had a crack that leaked – overflowed thousands of gallons of contaminated liquids after the slop tank was emptied into it.

6.25   Tracy and King protested dumping the slop tank's contents into the oil-water separator. Kent told King, "it'll be okay." Kent told Tracy that he knew it was illegal to dispose of hazardous materials in this fashion. Kent said he was afraid that Smith would fire him if he refused to comply.

### E. The March 21, 2019, illegal disposal of hazardous materials.

6.26   On or about the night of March 21, 2019, approximately 300-gallons of corn oil spilled onto the Facility's containment area. The overnight crew pressure washed the oil into containment vessels. The sump pump sent the oil over the containment wall and into a storm water ditch. Kent instructed King and other workers to use a vacuum trailer to pump the oil from the ditch and into the slop tank. The oil was then directed to the oil-water separator. The oil-water separator overflowed, sending the oil into ditches, drains, and a creek that runs in front of the Facility.

6.27   King told Kent that his plan called for an illegal disposal of hazardous materials. Kent ignored King's complaints.

### F. The March 28, 2019, illegal disposal of hazardous materials.

6.28   On or about March 28, 2019, employees allowed approximately 1,000-gallons of diesel to overflow while filling a railcar. Smith and Hensley witnessed the spill. Smith, Kent, and Hensley instructed employees to soak up as much diesel as they could with absorbent pads. They instructed the employees to vacuum the remaining diesel with the vacuum truck.

6.29    The vacuum truck pumped the diesel into the slop tank. The diesel was then directed to the oil-water separator. The oil-water separator overflowed, sending the oil into ditches, drains, and a creek that runs in front of the Facility.

6.30    King and Tracy objected. They told Kent to report the incident to MDEQ and to employ a professional cleanup crew. Kent refused. Kent said Smith would not pay for a professional cleanup and did not want the incident reported.

6.31    On or about April 1, 2019, Tracy asked Hensley how to dispose of the absorbent pads used to clean the diesel spill, as well as other soiled absorbent pads that had accumulated over the past several months. Hensley responded in an email, "Ed said on Friday to put in plastic trash bags and throw in the dumpster." Tracy and King both complained to Kent that it was illegal to dispose of the soiled absorbent pads in this fashion. Kent told them that he had to follow Smith's instructions.

### G. The June 24, 2019, illegal disposal of hazardous materials.

6.32    On or about June 24, 2019, another large oil spill occurred at the Facility. Smith ordered Kent to instruct employees to pressure wash the oil into the oil-water separator. Kent gave the instruction to several employees. As before, the oil-water separator overflowed, sending the oil into ditches, drains, and a creek that runs in front of the Facility.

### H. The July 15-17, 2019, retaliatory discharges of Jaxon Energy employees.

6.33    On Monday, July 15, 2019, Smith terminated King's employment in retaliation for his refusal to participate in a variety of criminal activities and for reporting to management criminal activities that jeopardized the environment and employee health and safety. Included among the activities that King protested and reported were the numerous illegal disposals of hazardous materials alleged herein and the theft of water from the City of Jackson.

6.34    Dustin Holmes was employed by Jaxon Energy as a member of the plant management team. His duties included training and supervising A-operators in the operation of the diagnostic

control station, serving as an A-operator approximately three (3) times per week, and performing other day-to-day tasks as necessary and instructed. Smith terminated Holmes's employment on July 15, 2019, in retaliation for Holmes's refusal to participate in a variety of criminal activities and for reporting to management criminal activities that jeopardized employee health and safety. Included among the activities that Holmes protested was Smith's attempt to compel employees to work around a damaged and dangerous crane.

6.35    D'Angelo Hopkins, Shaquille Stamps, and Joshua Mitchell were employed by Jaxon Energy as a B-operators at the Facility. Smith terminated each of their employment on July 15 and 17, 2019, in retaliation for their respective refusals to participate in criminal activity. Included among the activities they protested and reported was management's efforts to compel them to work in dangerous tanks without adequate personal protective gear.

6.36    Smith terminated Tracy's employment on July 16, 019, in retaliation for her refusal to participate in a variety of criminal activities and for reporting to management criminal activities that jeopardized the environment and employee health and safety. Included among the activities that Tracy protested and reported were the numerous illegal disposals of hazardous materials alleged herein and the theft of water from the City of Jackson.

6.37    All six (6) of these former employees filed OSHA whistleblower actions. They have also filed civil actions against Jaxon Energy, Emerald, Smitty's, Kent, and Smith, alleging battery, retaliatory discharge, intentional infliction of emotional distress, conspiracy, and respondeat superior. These actions remain pending. A true and correct copy of the First Amended Complaint filed by the six former employees is attached hereto and incorporated herein as Exhibit 4.

**I. The July 26, 2019, MDEQ Compliance Evaluation Inspection.**

6.38    On or about July 26, 2019, the MDEQ Office of Pollution Control conducted a Compliance Evaluation Inspection ("CEI") of the Facility "in response to a complaint filed with

MDEQ (Reference CTS#47031) and to determine compliance status of the Jaxon Energy LLC, Jaxon Energy Processing Plant with Individual NPDES Stormwater Permit Number MSS062171." The Inspection Report provides as follows:

We began the inspection in a facility conference room by discussing the nature of the complaint with Mr. [Matthew] Turner and asking for a description of the plant's processes and stormwater management. He again stated that he was new to the plant and plant operations and was unfamiliar with how stormwater is managed and was unable to produce any stormwater records.

Shortly after we started the meeting, Mr. Kent returned to the facility and joined us. He was asked about stormwater records. The permit requires retention for three years of the following: Monthly Inspections, Comprehensive Annual [Stormwater Pollution Prevention Plan "SWPPP"] Evaluation, copies of DMR's, Staff Training documentation, and Monthly Jar Tests. Mr. Kent informed us that any stormwater records were on [former-office manager] Misty [Tracy]'s computer and they were having trouble accessing them. At this time of the inspection, we were joined in the conference room by Ms. Annie McIlwain, P.E. with PPM Consultants. Ms. McIlwain stated that PPM developed the SWPPP for the facility and that she was the lead engineer for developing the SWPPP.

After being unable to review any stormwater records, we continued the inspection by conducting a visual inspection of the facility and the facility's stormwater management. Mr. Kent informed us that facility staff pulls samples from both outfalls and transports them to Waypoint Analytical for analysis. The facility has several small grate covered "dry" sumps that collect and hold stormwater. (Figure 1) We were informed that collected stormwater in these sumps have to be manually pumped down by facility staff. The stormwater is pumped into a holding tank. All of the "dry" sumps were full of stormwater and would not have any capacity to hold any additional stormwater if a rain event occurred. The facility also has one "wet" sump that is connected to an oil/water separator. (Figure 2) The SWPP shows the oil/water separator discharging into a paved ditch flowing to a concrete dam with a valve that can be shut off if a sheen is detected. The visual inspection determined that the current configuration of the oil/water separator, concrete dam and valve in place is inconsistent with the description in the SWPPP. (Figures 3-5) The dam does not have a valve in place and the oil/water separator discharges directly into a drainage ditch on the east side of the facility. In viewing Outfall 001 there was some ponding of water that had a deep red tint to it. (Figure 6) Neither Mr. Kent or Mr. Turner had an explanation for or a possible source of this discolored water.

We continued the visual inspection by reviewing the rail spur loading/unloading area. There were numerous spills of oily substances noted in this area. (Figures 7-8) Mr. Kent was asked if they used drip pans during the loading/unloading operations. He stated they had 5-gallon buckets that could be used for drips. Stormwater runoff from this area flows to the north discharging into a small ditch where outfall 002 is located (Figure 9)

6.39    Kent's comments to the MDEQ inspectors were misleading. Tracy had not prepared, submitted, or maintained stormwater reports for Jaxon Energy since December 17, 2018. Kent had assumed this task from her after Tracy refused to submit false and misleading information to MDEQ.

6.40    The MDEQ reported its findings to Jaxon Energy in a Notice of Violation dated September 11, 2019. The notice revealed the following violations were observed in the CEI:

a.   Violation of R-1: Failure to record monitoring results;

b.   Violation of S-1: Failure to conduct Storm Water Annual Reporting;

c.   Violation of S-2: Failure to conduct site inspections;

d.   Violation of S-4(4): Failure to amend the SWPPP; and,

e.   Violation of S-7: Failure to conduct and document SWPPP personnel training.

6.41    The MDEQ Office of Pollution Control requested that Jaxon Energy "respond to these alleged violations within ten days following receipt of this letter. This response should contain: (1) actions that have been taken to correct the violations, (2) a schedule for correcting the violations, or (3) reasons why you believe the alleged violations did not exist. We will review this information before determining if further action is warranted. Failure to submit this information may result in enforcement action."

6.42    Jaxon Energy responded to the Notice of Violation on September 20, 2019. Jaxon Energy admitted the violations and proposed various corrective actions for the future. Among its proposals was the creation of "a new compliance calendar" and "performing improvements at the facility in order to better manage stormwater effluent and flow at the site." Jaxon Energy also indicated that it had asked PPM Consultants, Inc. "to perform our stormwater training" and "to perform quarterly audits/site visits to ensure facility personnel are following proper stormwater management protocols." True and correct copies of the Notice of Violation, Inspection Report, and response of Jaxon Energy are attached hereto and incorporated herein *in globo* as Exhibit 5.

**J. The January 23, 2020, illegal disposal of hazardous materials.**

6.43    On or about January 23, 2020, Jaxon Energy spilled approximately 30,000-gallons of corn oil. The corn oil covered the entire containment pad and overflowed into the ditches, drains, and creek that runs along the Facility. Jaxon retained E3 Environmental to undertake cleanup efforts. These efforts remain ongoing.

## CAUSES OF ACTION

## COUNT #1: CONVERSION

7.1    The City of Jackson incorporates the above and foregoing paragraphs into this count as if fully pleaded herein.

7.2    A plaintiff can maintain an action for conversion if he can prove the defendant wrongfully possessed the plaintiff's personal property, or the defendant exercised dominion in exclusion or defiance of the plaintiff's right to his personal property, or the defendant made an unauthorized and injurious use of the plaintiff's personal property, or the defendant wrongfully detained the plaintiff's property after demand. *Wallace v. United Mississippi Bank*, 726 So. 2d 578, 588 (Miss. 1998). "While conversion requires an intentional act, . . . the required intent does not have to be the intent to be a wrongdoer," and "good faith is not necessarily an excuse." *Id.* "The intent required is not necessarily a matter of conscious wrongdoing. It is rather an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Id.* For example, "[a] purchaser of stolen goods or an auctioneer who sells them in the utmost good faith becomes a converter, since the auctioneer's acts are an interference with the control of the property. A mistake of law is no defense." *Id.*

7.3    The traditional and usual measure of damages for conversion is the value of the personal property at the time and place of its conversion, plus interest from the date of the conversion. *Bender v. North Meridian Mobile Home Park*, 636 So. 2d 385, 390 (Miss. 1994); *Greenlee v. Mitchell*, 607 So.

2d 97 (Miss. 1992). Punitive damages are also recoverable if the defendant's acts were willful, wrong, malicious, or oppressive. *West v. Combs*, 642 So. 2d 917 (Miss. 1994).

7.4      Defendants have intentionally taken, used, and not paid the City of Jackson for tens of millions of gallons of water supplied to the Facility over the course of the last two years. This unauthorized and injurious use has caused damage to the City of Jackson.

7.5      Defendants intended to exercise dominion and control over the water supplied to the Facility by the City of Jackson, and have done so willfully, wrongfully, surreptitiously, and in bad faith.

7.6      The City of Jackson is entitled to recover compensatory, actual, and consequential damages from the defendants as a result of their conversion.

7.7      The Mississippi Code renders it a crime to tamper with water delivery devices and to intentionally take water from the City of Jackson. *Miss. Code Ann.* § 97-25-3. Likewise, the City of Jackson's Code of Ordinances renders it a crime to tamper with water delivery devices and to intentionally take water. *Jackson, MS Code of Ordinances* §§ 122-21, 122-23, 122-25, 122-26, 122-28, 122-29, 122-37, 122-38, 122-39.

7.8      The City of Jackson is also entitled to recover punitive damages from the defendants because their tortious conduct was willful, wrong, wanton, criminal, and outrageous.

## COUNT #2: UNJUST ENRICHMENT

8.1      The City of Jackson incorporates the above and foregoing paragraphs into this count as if fully pleaded herein.

8.2      A claim for unjust enrichment lies where the defendant received a benefit, at the plaintiff's expense, and under circumstances where it would be unjust for the defendant to retain the benefits. *Unjust Enrichment*, Mississippi Chancery Practice § 41:5 (2019 ed.). The Mississippi Supreme Court has defined unjust enrichment as follows: "The doctrine of unjust enrichment or recovery in quasi-contract applies to situations where there is no legal contract but where the person sought to be

charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another, the courts imposing a duty to refund the money or the use value of the property to the person to whom in good conscience it ought not belong." *Hans v. Hans*, 482 So. 2d 1117, 1122 (Miss. 1986).

8.3     Defendants have intentionally misappropriated tens of millions of gallons of water from the City of Jackson for use at the Facility.

8.4     Defendants have been unjustly enriched and owe the City of Jackson the duty to pay for the water they have misappropriated.

8.5     The City of Jackson is entitled to recover punitive damages from the defendants because their unjust enrichment was willful, wrong, wanton, criminal, surreptitious, and outrageous.

## COUNT #3: QUANTUM MERUIT

9.1     The City of Jackson incorporates the above and foregoing paragraphs into this count as if fully pleaded herein.

9.2     "Quantum meruit recovery is a contract remedy which may be premised either on express or 'implied' contract, and a prerequisite to establishing grounds for quantum meruit recovery is claimant's reasonable expectation of compensation." *Tupelo Redevelopment Agency v. Gray Corp., Inc.*, 972 So. 2d 495, 514 (Miss. 2007) (quoting, *In re Estate of Fizner*, 881 So. 2d 164, 173 (Miss. 2003)). The elements of quantum meruit are: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; and, (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services, was expected to be paid by the person sought to be charged. *Ace Pipe Cleaning, Inc. v. Hemphill Const. Co., Inc.*, 134 So. 3d 799, 805-06 (Miss. Ct. App. 2014) (quoting, *In re Estate of Fizner*, 881 So. 2d at 173-74).

9.3     The City of Jackson supplied tens of millions of gallons of water to the Facility.

9.4     The City of Jackson reasonably expects to be paid for the water and services provided and is entitled to be paid by the defendants for the water and services provided.

9.5     The City of Jackson is entitled to recover punitive damages from the defendants because they willfully, wrongfully, wantonly, surreptitiously, and criminally took, used, and failed to pay for the water and services provided by the City of Jackson.

## COUNT #4: CONSTRUCTIVE TRUST

10.1     The City of Jackson incorporates the above and foregoing paragraphs into this count as if fully pleaded herein.

10.2     "A constructive trust is: one that arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy." *Kilpatrick v. White Hall on MS River, LLC*, 207 So. 3d 1241 (Miss. 2016).

10.3     The City of Jackson is entitled to the imposition of a constructive trust on the money the defendants hold and should have paid for the service and water provided to the Facility.

10.4     The City of Jackson is entitled to recover punitive damages from the defendants because they willfully, wrongfully, wantonly, surreptitiously, and criminally took, used, and failed to pay for the water and services provided to the Facility.

## COUNT #5: PUBLIC NUISANCE

11.1     The City of Jackson incorporates the above and foregoing paragraphs into this count as if fully pleaded herein.

11.2     Article IV of the City of Jackson's Code of Ordinances is titled "Stormwater Quality Protection" and encompasses Code Sections 122-301 through 122-309.

11.3     Section 122-303 declares "a public nuisance for any person to directly or indirectly release significant materials, pollutants, or stormwater, without proper authorization from the director of the department of public works or his designee, in quantities, rates, or concentrations that may reasonably be expected to cause or contribute to any of the following: Damage to a public right-of-way or public storm drain system; a violation of any applicable water quality standard; or a violation of the stormwater NPDES permit for the city."

11.4     Section 122-304 lists several prohibited practices, including the following:

(a) It shall be unlawful for any person to use, store, treat or dispose of stormwater, pollutants, or significant materials in a manner that creates a public nuisance as defined in section 122-303 of this article.

(b) It shall be unlawful for any person to release to a publicly owned right-of-way or public storm drain system any substance that is not composed entirely of stormwater . . ..

(c) It shall be unlawful to use, store, spill, dump, or dispose of significant materials in a manner that could reasonably be expected to cause or contribute to the addition of pollutants to a public storm drain system.

11.5     Section 122-308(e) provides that, "[a] person who violates this article is subject to a civil action brought by the City of Jackson in any court of competent jurisdiction."

11.6     Section 122-308(a) provides that, "a violation of any provision of this article shall be a misdemeanor punishable by a fine not exceeding $1,000.00 or imprisonment not exceeding 90 days, or both for each offense. Each day of violation shall be a separate offense."

11.7     Section 122-308(b) provides that, "Any person having control over an activity or any real property, or who causes, authorizes, facilitates, aids or abets any violation of any provision of this article, or who fails to abate any nuisance or prohibited practices for which the person is responsible, is guilty of a misdemeanor punishable by a fine not exceeding $1,000.00 or imprisonment not exceeding 90 days, or both for each offense. Each day of violation shall be a separate offense."

11.8     Defendants violated Sections 122-303 and 122-304 on the dates and in the manner set forth herein.

11.9     The City of Jackson is entitled to recover compensatory, consequential, actual and/or other damages from Jaxon Energy that were caused by Jaxon Energy's unlawful actions and inactions.

11.10    The City of Jackson is also entitled to recover punitive damages from Jaxon Energy because its conduct was willful, wanton, wrong, outrageous, criminal, and in reckless disregard of the safety, health, and well-being of the public.

## COUNT #6: OFFICER, DIRECTOR, & AGENT LIABILITY

12.1     The City of Jackson incorporates the above and foregoing paragraphs into this count as if fully pleaded herein.

12.2     The Mississippi Supreme Court has held, "the general rule is well established that when a corporate officer directly participates in or authorizes the commission of a tort, even on behalf of the corporation, he may be held personally liable." *Mississippi Printing Co., Inc. v. Maris, West & Baker, Inc.*, 492 So. 2d 977, 978 (Miss. 1986). The Court has further explained as follows:

> A director, officer, or agent is liable for the torts of the corporation or of other directors, officers, or agents when, and only when, he has participated in the tortious act, or has authorized or directed it, or has acted in his own behalf, or has had any knowledge of, or given any consent to, the act or transaction, or has acquiesced in it when he either knew or by the exercise of reasonable care should have known of it and should have objected and taken steps to prevent it.
>
> What is required is some showing of direct personal involvement by the corporate officer in some decision or action which is causally related to plaintiff's injury.

*Aldridge v. Aldridge*, 168 So. 3d 1127, 1141 (Miss. Ct. App. 2014) (quoting, *Turner v. Wilson*, 620 So. 2d 545, 548-49 (Miss. 1993), which was quoting, 19 C.J.S. *Corporations* § 544 (1990)).

12.3     Smith, Tate, Hensley, and Kent are liable in the premises for the following reasons:

a.   they participated in tortious acts alleged herein;

b.   they authorized and directed tortious acts alleged herein;

- 19 -

    c.   they acted tortiously in their own behalves;

    d.   they had knowledge of and gave consent to tortious actions alleged herein;

    e.   they acquiesced in tortious acts alleged herein while having actual knowledge of the tortious acts, they should have objected to the tortious acts, and they should have taken steps to prevent the tortious acts; and/or,

    f.   they acquiesced in tortious acts alleged herein when they should have known of the tortious acts, they should have objected to the tortious acts, and they should have taken steps to prevent the tortious acts.

12.4    The City of Jackson incurred compensatory, actual, and consequential damages as a proximate result of the tortious actions and inactions of Smith, Tate, Hensley, and Kent.

12.5    The City of Jackson is entitled to recover punitive damages from Smith, Tate, Hensley, and Kent because their tortious conduct was willful, wrong, wanton, outrageous, criminal, and in reckless disregard of the safety, health, and well-being of the public.

## COUNT #7: RESPONDEAT SUPERIOR

13.1    The City of Jackson incorporates the above and foregoing paragraphs into this count as if fully pleaded herein.

13.2    Under the doctrine of respondeat superior, an employer is liable for the torts committed by its employees while in the course and scope of their employment.

13.3.    Jaxon Energy is liable for the torts of Smith, Kent, Tate, and Hensley pursuant to respondeat superior.

13.4    Emerald is liable for the torts of Smith pursuant to respondeat superior.

13.5    Smitty's is liable for the torts of Smith, Tate, and Hensley pursuant to respondeat superior.

## COUNT #8: CONSPIRACY TO CONVERT WATER

14.1    The City of Jackson incorporates the above and foregoing paragraphs into this count as if fully pleaded herein.

14.2    Civil conspiracies consist of an agreement between two or more persons, to accomplish an unlawful purpose or a lawful purpose unlawfully, an overt act in furtherance of the conspiracy, and damages to the plaintiff as a proximate result.

14.3    Defendants agreed to convert tens of millions of gallons of water from the City of Jackson. The agreement is evidenced, among other things, by their failures to mitigate or prevent the conversion when all defendants had notice of the wrongdoing; the close relationship between and among the defendants; the controlling role of each individual defendant; and, the intertwined management of the Facility.

14.4    Defendants undertook acts in furtherance of the conspiracy when, among other things, Smith and Tate ordered office manager Misty Tracy to cease her efforts to ensure the City of Jackson was paid for the Facility's water usage; Tate and others rejected King's efforts to ensure the City of Jackson was paid for the Facility's water usage; and, Defendants failed to ensure payment was made to the City of Jackson despite having actual knowledge of the conversion of tens of millions of gallons of water.

14.5    The City of Jackson incurred compensatory, actual, and consequential damages as a proximate result of the conspiracy to convert tens of millions of gallons of water, including the value of the misappropriated water and the interest on the unpaid sums of money.

14.6    The conspiracy to convert tens of millions of gallons of water is of such an outrageous, wanton, willful, surreptitious, criminal, and/or reckless nature that punitive damages should be awarded to the City of Jackson.

## COUNT #9: CONSPIRACY TO CREATE AND CONCEAL PUBLIC NUISANCE

15.1     The City of Jackson incorporates the above and foregoing paragraphs into this count as if fully pleaded herein.

15.2     Defendants agreed to violate Article IV of the Code of Ordinances on numerous occasions and agreed to conceal their violations. The agreement is evidenced, among other things, by their failures to mitigate or prevent the violations when all defendants had notice of the wrongdoing; the close relationship between and among the defendants; the controlling role of each individual defendant; and, the intertwined management of the Facility.

15.3     Defendants undertook numerous actions in furtherance of the conspiracy to violate and conceal violations of the Code of Ordinances, including those actions set forth herein.

15.4     The City of Jackson incurred compensatory, actual, and consequential damages as a proximate result of the conspiracy to violate and conceal violations of the Code of Ordinances.

15.5     The conspiracy to violate and conceal violations of the Code of Ordinances is of such an outrageous, wanton, willful, criminal, and/or reckless nature that punitive damages should be awarded to the City of Jackson.

## COUNT #10: AIDING-AND-ABETTING CONVERSION

16.1     The City of Jackson incorporates the above and foregoing paragraphs into this count as if fully pleaded herein.

16.2     Defendants knew Jaxon Energy had converted and was continuing to convert tens of millions of gallons of water from the City of Jackson.

16.3     Each defendant provided substantial assistance to the others in assisting and concealing the conversion, and as a consequence, each defendant has caused injury and damage to the City of Jackson.

16.4     Defendants' individual and collective efforts to aid-and-abet the conversion of tens of millions of gallons of water is of such an outrageous, wanton, willful, surreptitious, criminal, and/or reckless nature that punitive damages should be awarded to the City of Jackson.

### COUNT #11: AIDING-AND-ABETTING PUBLIC NUISANCE

17.1     The City of Jackson incorporates the above and foregoing paragraphs into this count as if fully pleaded herein.

17.2     Defendants knew Jaxon Energy had engaged and was continuing to engage in activities which rendered it a public nuisance.

17.3     Each defendant provided substantial assistance to the others in assisting and concealing the public nuisance, and as a consequence, each defendant has caused injury and damage to the City of Jackson.

17.4     Defendants' individual and collective efforts to aid-and-abet the public nuisance is of such an outrageous, wanton, willful, criminal, and/or reckless nature that punitive damages should be awarded to the City of Jackson.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff demands judgment against Defendants, jointly and severally, for the following relief: (a) compensatory damages; (b) pre-judgment and post-judgment interest at the maximum rate allowable by law; (c) punitive damages; (d) attorneys' fees and costs of litigation; and, (e) such other and further legal and equitable relief available under all applicable laws and any relief the Court deems just and appropriate.

**RESPECTFULLY SUBMITTED**, this 23rd day of April 2020.


By:      /s/: *William M. Quin II*
William M. Quin II (MS Bar No. 10834)

*Attorney for the City of Jackson, Mississippi*

**OF COUNSEL:**

William M. Quin II
**MCCRANEY MONTAGNET QUIN & NOBLE, PLLC**
602 Steed Road, Suite 200
Ridgeland, Mississippi 39157
Telephone:      (601) 707-5725
Facsimile:      (601) 510-2939
Email:  wquin@mmqnlaw.com

Merrida P. Coxwell Jr.
**COXWELL & ASSOCIATES, PLLC**
500 North State Street
Jackson, Mississippi 39201
Telephone:      (601) 948-1600
Facsimile:      (601) 948-7097
Email: merridac@coxwelllaw.com